UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANGEL TORO,<br>　　Plaintiff,<br><br>v.<br><br>STEPHEN MURPHY, ESTATE OF<br>PAUL MURPHY, RICHARD WALSH,<br>and THE CITY OF BOSTON,<br>　　Defendants. | C.A. No. 07-11721<br><br>**AMENDED COMPLAINT** |

## **INTRODUCTION**

1.　This is an action for money damages for the violation of the plaintiff's constitutional rights, brought pursuant to 42 U.S.C. § 1983 and G.L. c. 12, § 11I. Plaintiff Angel Toro alleges that Steven Murphy, Paul Murphy, and Richard Walsh (the "Defendant Police Officers"), withheld exculpatory evidence and conspired to obtain false testimony from several witnesses, all in violation of the plaintiff's rights under the Massachusetts Constitution and the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution. As a result of the defendant police officers' violation of plaintiff's constitutional right, the plaintiff was convicted of first-degree murder and sentenced to life in prison without parole in 1983. On September 16, 2004, after spending over twenty-three years in prison, a judge vacated his conviction. The District Attorney subsequently entered *nolle prosequi*. The plaintiff further alleges that the defendant City of Boston, through its police department, had a policy, custom, or practice of improper and inadequate investigation and discipline of acts of misconduct committed by Boston police officers that included, but was not limited to, the withholding of exculpatory evidence.

## JURISDICTION

2. Jurisdiction is based on 28 U.S.C. §§1331 and 1343, and on the pendent jurisdiction of this Court to entertain a claim arising under state law.

## PARTIES

3. Plaintiff Angel Toro is a resident of Florida.

4. Defendant Stephen Murphy is a citizen of Massachusetts who, at all times material to the allegations in the Complaint, was a Boston police officer employed by the City of Boston. Stephen Murphy is being sued in his individual capacity.

5. Defendant Paul Murphy, now deceased, is a citizen of Massachusetts who, at all times material to the allegations in the Complaint, was a Boston police officer employed by the City of Boston. Paul Murphy is being sued in his individual capacity.

6. Defendant Richard Walsh, now deceased, was a citizen of Massachusetts who, at all times material to the allegations in the Complaint, was a Boston police officer employed by the City of Boston. Richard Walsh is being sued in his individual capacity.

7. Defendant City of Boston is a municipality duly authorized under the laws of the Commonwealth of Massachusetts and, at all times material to the allegations in the Complaint, was the employer of the individual defendants.

## FACTS

8. In April 1981, Kathleen Downy, a desk clerk at the Dorchester, Massachusetts, Howard Johnson's, was murdered during an armed robbery.

9. The plaintiff was arrested for this crime and charged with first-degree murder.

10. The plaintiff was held without bail.

11. The plaintiff's first trial was declared a mistrial because of a hung jury.

12. In 1983, the plaintiff was convicted of the first-degree murder of Kathleen Downey.

13. At a hearing on the plaintiff's motion for a new trial in 2004, two witnesses recanted their trial testimony.

14. These witnesses testified at the motion hearing that they were told they had to testify that the plaintiff was clean shaven at the time of the murder, because eyewitnesses to the murder had testified that the murderer was clean shaven. In fact, the plaintiff had a beard at the time of the murder and, therefore, could not possibly have been the murderer.

15. The witnesses also testified that police officers lied to them, and told them that a 45 Colt revolver the plaintiff left at the witnesses' gun shop was the murder weapon. The police officers did this in order to force the witnesses' false testimony, and caused the witnesses to be fearful that they, too, would be charged if they did not perjure themselves at the plaintiff's trial.

16. Boston Police Detective Arthur Linsky was one of the masterminds of the framing of the plaintiff for the murder. Detective Linsky had a vendetta against the plaintiff, and had vowed to "get him" and send him away for life.

17. Before the plaintiff's trial, the Supreme Judicial Court of Massachusetts had ruled that Detective Linsky had lied before a grand jury in the case of *Commonwealth v. Salman*, 387 Mass. 160 (1982). Detective Linsky had a notorious reputation as a crooked police officer but, nevertheless, he was left on the Boston police force in a position of high responsibility by the defendant, City of Boston.

18. Detective Linsky was a close friend of the Howard Johnson's barmaid, Jan Montgomery, who was on duty the night of the murder. On that night, Montgomery told Detective Linsky that she did not see the murderer. Montgomery repeated her statement when questioned again. Afterward, she called her friend, Detective Linsky, to change her story, and

claimed that she did see the murderer. Later, Montgomery identified the plaintiff as the murderer from a photograph shown to her by Linsky of the plaintiff that was taken of him when he was clean shaven.

19. Casper Diamond, another individual at the Howard Johnson's that night, also had originally denied seeing the murderer. Miraculously, however, Dramant also subsequently selected a photograph of the clean shaven plaintiff shown to him by Linsky and identified him as the murderer.

20. Detective Linsky, however, did not know that the plaintiff had grown a beard since the last time Detective Linsky has seen him and that the plaintiff had this beard at the time of the murder.

21. The plaintiff passed a polygraph in 1982, with a score of +23 when a +6 is passing.

22. Defendant Paul Murphy falsified his police report to indicate that a witness had identified a Puerto Rican, as was the plaintiff, leaving the scene of the murder. However, the witness, William Haverstock, told Paul Murphy that the man he saw was white with dark blonde hair. Paul Murphy asked Mr. Haverstock several times if the suspect was Puerto Rican in a effort to convince Mr. Haverstock that the murderer was in fact Puerto Rican, and did this to deny the Toro impeachment evidence at the trial. Paul Murphy further visited Mr. Haverstock with a line-up photo of eight Hispanic males and pressured Haverstock to narrow down the possibility of them being the murderer, even though Haverstock told Paul Murphy that none of the individuals depicted looked like the man he saw. Paul Murphy became increasingly frustrated with Mr. Haverstock and finally told him, "This is the guy," as he pointed to the photograph of the plaintiff.

23. Defendant Stephen Murphy was the lead investigator in the Kathleen Downy

murder case. Both Stephen Murphy and defendant Richard Walsh together suppressed a police report, dated May 1, 1981, that made reference to an April 30, 1981, robbery attempt that occurred in Malden, Massachusetts. The May 1, 1981, report noted that one of the Malden robbers, "fits the general description of the subject wanted in connection with the murder of Kathleen Downy on April 19th 1981." The report also indicated that the robber in Malden possessed a weapon that had a sawed off barrel and, according to a Boston Police ballistician, so did the weapon that was used to murder Kathleen Downy.

24. The May 1, 1981, report further stated that a photograph of the robber in the Malden robbery would be shown to the witnesses of the Downy murder. That photograph, however, was never shown.

25. The May 1, 1981, report also revealed that, according to intelligence sources, the Malden robber had been involved in other hold-ups. The plaintiff, however, had never been charged with a robbery.

26. The May 1, 1981, report was highly exculpatory and strongly suggested that someone other than the plaintiff committed the murder. If the May 1, 1981, report had been turned over to the defense, the plaintiff most likely would have been acquitted. The report also could have been used to cross-examine Stephen Murphy, the lead investigator in the Kathleen Downy murder case, as well as other defendants, on their failure to fully investigate.

27. Defendant Stephen Murphy's actions in purposefully withholding this highly exculpatory evidence are despicable. What is even more egregious, however, is that in 1983 a meeting held at the District Attorney's office, Stephen Murphy never mentioned the May 1, 1981, report to the plaintiff's lawyer, who was present at the meeting. The meeting was requested by the plaintiff's lawyer in order to demand that Stephen Murphy search the Boston police department files once again for any exculpatory evidence.

28. When the assistant district attorney assigned to the new trial hearing was preparing for the hearing, he elicited the help of Boston police department homicide detective, Wayne Rock. Rock had no involvement in or knowledge of the unconstitutional actions of the previous defendant police officers in this case. In reviewing the original Boston police department files, Rock came across the highly exculpatory May 1, 1981, report. Rock recognized and respected the United States Constitution, and admirably did what the other police officers had dishonorably failed to do for 25 years – he brought the May 1, 1981, report to the attention of the new district attorney who turned it over to the defense.

29. Defendant City of Boston implicitly tolerated various unlawful police practices, including the suppression of exculpatory evidence and the solicitation of perjury, by failing to investigate properly and punish adequately Boston police officers who withheld exculpatory evidence and gave false testimony. Boston police officers generally thus believed that they could violate the constitutional rights of defendants with impunity.

30. Because of the actions of the defendant police officers, and the city of Boston, thru it's police department, the plaintiff sustained severe and permanent personal and emotional injuries including, but not limited to, loss of liberty, loss of income, humiliation, emotional distress, and the loss of the companionship of his wife and children.

**COUNT I:**
**(Withholding of Exculpatory Evidence)**
**VIOLATION OF 42 U.S.C. § 1983 BY DEFENDANT POLICE OFFICERS**
**ESTATE OF PAUL MURPHY, STEVEN MURPHY, AND THE ESTATE OF**
**RICHARD WALSH**

31. The plaintiff restates the allegations in paragraphs 1 through 30 and incorporates said paragraphs herein.

32. By their actions described in paragraphs 1 through 30, the Defendant Police Officers deprived the plaintiff of due process and of his right to a fair trial, in violation of

42 U.S.C. § 1983, and the Fifth, Sixth, and Fourteenth Amendments to the Constitution of the United States, and are jointly liable.

**COUNT II:**
**(Conspiracy)**
**VIOLATION OF 42 U.S.C. § 1983 BY DEFENDANT POLICE OFFICERS**
**PAUL MURPHY, STEVEN MURPHY, AND THE ESTATE OF RICHARD WALSH**

33. The plaintiff restates the allegations in paragraphs 1 through 32, and incorporates said paragraphs herein.

34. By their actions described in paragraphs 1 through 32, the defendant police officers conspired with officer Arthur Linsky and others to deprive the plaintiff of his constitutional rights to receive exculpatory evidence and to a fair trial.

35. In furtherance of this conspiracy, the defendant police officers concealed the existence of the exculpatory evidence and encouraged witnesses to lie.

**COUNT III:**
**(Custom or Policy)**
**VIOLATION OF 42 U.S.C. §1983 BY THE DEFENDANT**
**THE CITY OF BOSTON**

36. The plaintiff restates the allegations in paragraphs 1 through 35, and incorporates said paragraphs herein.

37. Defendant the City of Boston maintains policies, customs, or practices exhibiting deliberate indifference to the constitutional rights of persons in Boston, which caused the violation of the plaintiff's rights.

38. It was the policy, custom, or practice of the City of Boston to allow the defendant police officers, and other members of the Boston police department, to ignore laws, rules, and regulations governing proper police conduct. Pursuant to this policy, custom, or practice, the City of Boston implicitly tolerated unlawful police practices, including soliciting perjury and withholding of exculpatory evidence. The City of Boston also failed to adequately investigate

citizen complaints filed against its police officers and failed to properly train and supervise its police officers. The City of Boston tolerated a "Code of Silence" that allowed Boston police officers to violate, with impunity, the constitutional rights of citizens.

39. This custom and policy of the City of Boston goes back many years. As far back as 1981, a the Massachusetts Supreme Judicial Court judge found that Detective Linsky lied before the grand jury in the case of *Commonwealth v. Salmon,* 387 Mass. 160 (1982). No disciplinary action, however, was ever taken against Detective Linsky by the Boston police department.

40. In 1991, the then-Mayor of Boston, Raymond Flynn, requested that a special commission review the practices of the Boston police department. A commission was established, an investigation held, and a report, entitled the "St. Clair Report," was submitted on January 14, 1992.

41. The St. Clair Report reviewed complaints filed against Boston police department personnel since 1981.

42. The St. Clair Report found a wide range of problems within the Boston police department's internal affairs division.

43. The Report found that only 5.9% of the citizen complaints were sustained and stated that such a statistic, "strains the imagination as it assures 94% of the complaints are without merit."

44. Defendant City of Boston's policies, practices, or customs are illustrated by, but not limited to, the following conduct:

    a. In 1989, Christopher Harding was wrongfully arrested and convicted of attempted murder because members of the Boston police department committed perjury and withheld exculpatory evidence. On August 18, 1989, a shooting had taken in the

Mission Hill Housing Project where Mr. Harding lived. Boston police officers captured one suspect, but another fled. Officer Terrence O'Neil claimed that he witnessed Mr. Harding running away and that Mr. Harding fired three shots, one at Officer O'Neil. Officer Mitchell wrote a report supporting Officer O'Neil's claims, which she knew to be false. Boston police officer Michael Stratton testified at Mr. Harding's trial that he had witnessed Mr. Harding shoot at Officer O'Neil. The officers' version of the events was proven to be false by a ballistics expert at trial. The ballistician found conclusively that the bullet that struck the victim had been fired from a gun belonging to the other suspect, and that only three bullets were fired from that gun. Thus, it was impossible for Officers O'Neil, Stratton, or Mitchell to have witnessed three shots fired from a gun alleged to have been in the possession of Mr. Harding, as they all had claimed. The Boston police department suppressed the crucial exculpatory evidence of the ballistic expert's findings until just prior to Mr. Harding's trial. In addition, the Boston police department falsely stated that Officer Mitchell was out of town during the trial and was unavailable testify, solely because the Boston police department feared that Officer Mitchell might recant her earlier report. Mr. Harding was released after spending approximately seven years in jail. Boston police officers Stratton and Mitchell have never been disciplined in connection with this misconduct, and Officer O'Neil was not fired for his involvement in the misconduct until January 20, 2000.

  b.  In September of 1989, City of Boston police officers falsely arrested Gary Willoughby and charged him with a homicide. Mr. Willoughby was a poor Jamaican immigrant with no criminal record and no connection to the incident. Mr. Willoughby was acquitted of all wrongdoing in 1990, after a Boston police officer committed perjury before the grand jury. Mr. Willoughby subsequently sued the City of Boston and the

officer in question. The City of Boston paid for the officer's defense and, in 1994, compensated Mr. Willoughby for the wrongs committed against him. Again, the officer involved was never disciplined in connection with this incident.

    c.    In 1989, Marvin Mitchell was vindicated through DNA testing and his conviction for rape was vacated after he had served seven years and three months in prison for that crime. The victim described her assailant to the police as having worn pink pants. Mr. Mitchell had informed the police that he had been wearing gray pants on the day of the alleged attack. The victim also told the officers that the assailant had one crossed eye and was clean shaven. Mr. Mitchell did not have a crossed eye and had a goatee at the time of the incident. Nevertheless, Boston police officers Trent Holland and Robin DeMarco both falsely testified under oath that Mr. Mitchell, while being detained, suddenly exclaimed he had been wearing pink pants on the day the victim was attacked. Officers DeMarco and Holland also have never been disciplined in connection with this misconduct.

    d.    In 1989, Superior Court Judge Elizabeth A. Porada, who was later elevated to the Court of Appeals, threw out a jury's guilty verdicts on drug charges secured through the testimony of Boston police officer Trent Holland. When she threw out the verdicts, Judge Porada ordered an investigation into whether or not Officer Holland committed perjury. Judge Porada concluded that Officer Holland's testimony about watching a drug transaction from a certain vantage point was necessarily false because his view would have been obstructed by a building. The perjury investigation was conducted by Boston Police Sergeant James Curran. Not only was Officer Holland not disciplined in connection with this misconduct, he was later promoted to Detective.

    e.    On October 23, 1989, Charles and Carol Stuart were shot in the Mission

Hill neighborhood of Boston. William Bennett became a suspect and, through intimidation and coercion, the Boston Police produced witnesses to implicate him. The Boston Police threatened the witnesses with arrest, physical beatings, and imprisonment if they did not testify against Mr. Bennett. The police also planted evidence in the homes of some of the witnesses in order to pressure them into incriminating Mr. Bennett, and offered other witnesses money and other inducements in an attempt to coerce them into testifying falsely against Mr. Bennett. The officers further supplied witnesses with crucial facts previously known only to them, solely for the purpose of enhancing the witnesses' knowledge of incriminating facts against Mr. Bennett. Mr. Bennett was, in fact, innocent of the charges.

  f. On November 21, 1991, a Suffolk County Grand Jury returned indictments against Tarahn Harris for murder in the first degree. The Honorable Isaac Borenstein, Justice of the Superior Court, in ruling in favor of Mr. Harris' motion to dismiss the indictment, found that Boston police officer Herbert Spellman, "knowingly and intentionally falsified, recklessly fabricated, distorted, misled and deceived the grand jury." Indeed, Officer Spellman distorted Mr. Harris' statement, which served to suggest to the grand jury that Mr. Harris made incriminating statements. Officer Spellman failed to inform the jury of other statements made by Mr. Harris that were exculpatory in nature. Officer Spellman additionally assigned to Mr. Harris statements that Mr. Harris had not made, and knowledge that Mr. Harris may not have held. Judge Borenstein was "convinced that Officer Spellman knowingly falsified and distorted the evidence against Tarahn Harris...for the purpose of strengthening what appeared to be a weak case against Tarahn Harris." In response to a complaint of misconduct relating to this incident made to the Boston police department, on July 15, 1999, the Boston police department, in spite

of Judge Borenstein's findings, found the allegations against Officer Spellman to be "Not Sustained." The then-Police Commissioner accepted the finding.

    g.    In 1994, Jerome Goffigan, an 11-year-old child, was murdered. Donnell Johnson was charged with the murder. The case agent, Detective William Mahoney, suppressed exculpatory evidence and lied under oath in Mr. Johnson's murder trial. Mr. Johnson was convicted, but later released as an innocent man after serving five years in prison. Detective Mahoney was never charged with perjury and, pursuant to a compliant to Internal Affairs, was found only to have been negligent in failing to turn over exculpatory evidence.

45.    To this very day, the Internal Affairs Division of the Boston police department continues the practice of whitewashing serious complaints of police misconduct. If any misconduct is found in its investigations, it is only for a much lesser charge than what is merited by the evidence, and the penalties meted by the Boston police department do not fit the abuse.

## COUNT IV:
### (Threats, Intimidation, and Coercion)
### VIOLATION OF M.G.L. c. 12 §11I BY DEFENDANT POLICE OFFICERS PAUL MURPHY, STEVEN MURPHY, AND THE ESTATE OF RICHARD WALSH

46.    The plaintiff restates the allegations in paragraph 1 through 45, and incorporates said paragraphs herein.

47.    By the actions described in paragraphs 1 through 45, the Defendant Police Officers deprived the plaintiff of his civil rights, secured by the Constitutions of the United States of America and the Commonwealth of Massachusetts, through the use of threats, intimidation, and coercion, all in violation of G.L. c.12, §11I.

WHEREFORE**,** the plaintiff requests that this Honorable Court:

1.    Award compensatory damages against the defendants jointly and severally;

2. Award punitive damages against the defendants;

3. Award the costs of this action, including reasonable attorney's fees.

## JURY TRIAL DEMAND

A jury trial is hereby demanded.

                                    Respectfully submitted
                                    ANGEL TORO,
                                    By his attorney,

                                    //s/ Stephen Hrones_____
                                    Stephen Hrones BBO#242860
                                    HRONES, GARRITY & HEDGES LLP
                                    Lewis Wharf–Bay 232
                                    Boston, MA 02110-3927
                                    (617) 227-4019