UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 07 CA 11721

ANGEL TORO,
    **Plaintiff**

**v.**

STEPHEN MURPHY,
    **Defendant.**

## DEFENDANT'S LOCAL RULE 56.1 STATEMENT OF FACTS AND SUPPORTING EXHIBITS IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT[1]

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, the Defendant, Stephen Murphy, submits the statement of material facts of records to which there is no genuine dispute[2]:

1. On April 19, 1981, Easter Sunday, a robbery took place at the Howard Johnson's Motel in Dorchester, Massachusetts. April 19, 1981 Boston Police repot by Paul J. Murphy (attached as Exhibit B).

2. During this robbery, the sole perpetrator stole over $300 and murdered the lobby clerk, Kathleen Downey, by shooting her in the cashier's booth. ("Downey murder"). Exhibit B.

3. As the on-call homicide officer for Boston Police that night, Defendant Stephen Murphy ("Murphy") responded to the scene and became the lead

---

[1] All of the supporting documentation attached hereto and to the Affidavits submitted in conjunction herewith are true and accurate copies. Affidavit of Counsel (attached as Exhibit A).
[2] For the limited purpose the Defendant's Motion for Summary Judgment, the following facts are deemed undisputed.

investigator. Exhibit B; Dep. of Stephen Murphy p. 19 ll. 12-24 (attached as Exhibit C).

4. As head of the homicide unit of the Suffolk County District Attorney's Office ("SCDAO"), Assistant District Attorney John Kiernan ("ADA Kiernan") also responded to the scene. Dep. of John Kiernan p.40 ll. 4-6 (attached as Exhibit D).

5. Several witnesses, including Jean Montgomery ("Montgomery") and Casper Diamond ("Diamond"), were interviewed at the scene. Exhibit B.

6. On April 24, 1981, Murphy along with other members of the Boston Police Department that included sketch artist Robert Neville ("Neville"), went to Montgomery's house in order to do a composite sketch of the person Montgomery saw in the Howard Johnson's lobby right after the Downey murder. July 12, 1981 Boston Police Report by Det. Arthur Linsky and Paul McDonough (attached as Exhibit E).

7. Montgomery described the person she saw in the Howard Johnson's Lobby right after the Downey murder as a light skinned male, black hair, black moustache about 30 years old, 5'9" tall, 160 lbs., wearing a light blue sports jacket with an open necked shirt and the sport jacket also had cream colors on it. Exhibit E.

8. Once at Montgomery's house, Neville with Montgomery's help proceeded to sketch a composite drawing of what the perpetrator of the Downey murder looked like. Composite drawings by Robert Neville (attached as Exhibit F).

9. On April 30, 1981, a robbery took place at O'Neils Pharmacy in Malden, Massachusetts ("Malden robbery") where the perpetrator demanded all "schedule two drugs" from the pharmacist. April 30, 1981 Malden Police Report by Inspector John Rivers (attached as Exhibit G).

10. During the Malden robbery, the perpetrator, Pasquale Cardone ("Cardone"), along with an unknown accomplice attempted to rob the pharmacy. Exhibit G; May 1, 1981 Boston Police Report by Stephen Murphy (attached as Exhibit H).

11. At the time of the Malden robbery, Cardone was armed with a .22 caliber gun with a sawed-off barrel. Exhibit G; Exhibit H.

12. During the Malden robbery, Cardone was shot by the pharmacy clerk and subsequently died. Exhibit G; Exhibit H.

13. The unknown accomplice in the Malden robbery fled the scene and was never apprehended. Exhibit G.

14. On May 1, 1981, lead officer on the Downey murder, Defendant Stephen Murphy went to the City of Malden Police Department with Detective Richard Walsh to get information on the Malden robbery. Exhibit H; Exhibit C at p. 46 ll. 4-10.

15. In the Malden Police file, there was a sketch of the unknown accomplice ("the sketch"). April 30, 1981 Malden Police Identikit Sketch (attached as Exhibit I).

16. Based on the information he received, Murphy wrote a report about the Malden robbery ("the report"). Exhibit H.

17. Specifically, Murphy wrote about how the suspect, Cardone, fits the general description of the suspect in the Downey murder. Exhibit H.

18. Murphy has no present memory of withholding this report from the Suffolk County District Attorney's Office. Exhibit C at p. 59 ll. 10-12.

19. Murphy has no present memory of ever seeing the sketch before Toro's trial. Exhibit C at p. 55 ll. 9-24, p. 56-57.

20. Kiernan has no memory of whether the report was in the SCDAO's file prior to the trial in the Downey murder. Exhibit D at p. 86 ll. 19-23.

21. One of the general practices of the Boston Police in turning over reports to the SCDAO was to go to the assistant district attorney's office with the Boston Police homicide file so that the assistant district attorney can copy it. Exhibit D at p. 33-36.

22. Murphy's typical procedure in producing discovery in homicide cases to the SCDAO was to bring the Boston Police Department file to the prosecuting ADA so that the ADA would go through the file and select documents from it in order to meet the ADA's discovery obligations. Exhibit C at p. 44 ll. 18-24, p. 45 ll. 1-16.

23. At some point, a portion of the Boston Police file on the Downey murder was kept in Kiernan's office. Handwritten note from Paul Murphy to Lieut. Daley (attached as Exhibit J).

24. In May 1981, the Boston Police Department got a tip that the perpetrator of the Downey murder was the Plaintiff, Angel Toro ("Toro"). Exhibit C at p. 15 ll. 13-24.

25. Based on this tip, Murphy investigated Toro as a possible suspect. Exhibit C at p. 17 l. 24, p. 18 ll.1-6.

26. During his investigation, Murphy found out that Toro, who had been living in Pennsylvania at the time, had been in Boston the weekend of the Downey murder. Exhibit C at p. 21 ll.2-24, p. 22 ll. 1-15.

27. Murphy put Toro's photograph into a photo array for the two witnesses who were present at the Howard Johnson on the night of the Downey murder to view: Montgomery and Diamond. Exhibit C at p. 35 ll. 21-24, p. 36 ll. 1-14.

28. Only Montgomery could identify Toro as the person she saw in the hotel lobby right after the Downey murder. Exhibit C at p. 35 ll. 21-24, p. 36 ll. 1-10.

29. While Toro was being held in the Pennsylvania matter, Murphy traveled to Pennsylvania along with Montgomery in order to see if Montgomery could make out an identification based on a line-up. Exhibit C at p. 37 ll. 8-24.

30. During the line-up, Montgomery again identified Toro as the person she saw that night after the Downey murder. Exhibit C at p. 37 ll. 11-14.

31. On July 7, 1981, a Massachusetts grand jury indicted Toro for the murder of Kathleen Downey and the robbery of Howard Johnson's. (attached as Exhibit X.)

32. On May 13, 1982 Toro was arraigned on those charges and was originally represented by Attorney Willie Davis ("Atty. Davis"). Exhibit Dep. of Willie Davis p. 10 ll. 1-21 (hereinafter "Exhibit K") and Exhibit X.

33. During his representation of Toro, Atty. Davis never received any documents listing what discovery the SCDAO turned over to him in the Downey murder case. Exhibit K at p. 15 ll. 6-12.

34. During his representation of Toro, Atty. Davis never made a listing of documents he received from the SCDAO regarding the Downey murder case. Exhibit K at p. 15 ll. 15-24, p. 16 ll. 1-4.

35. Atty. Davis has no memory of any of the documents contained in his file in the case against Toro for the Downey murder. Exhibit K at p. 30 ll. 7-16.

36. Kiernan has no memory of what documents he turned over to Atty. Davis in the Downey murder case. Exhibit D at p. 46 ll. 1-4.

37. No documentation exists which lists what documents Kiernan turned over to Atty. Davis in the Downey murder case. Exhibit D at p. 46 ll. 5-8.

38. After being found guilty on a separate unrelated charge out of Chelsea, Toro fired Atty. Davis and hired Attorney Frank Kelleher ("Atty. Kelleher") to represent him on the charges stemming from the Downey murder. Exhibit K at p. 10 ll.15-21.

39. After Atty. Kelleher took over Toro's case in the Downey murder, Atty. Davis gave him his entire file and did not memorialize what specific documents he gave to Atty. Kelleher. Exhibit K at p. 32 ll. 2-11.

40. When Atty. Kelleher was hired, the ADA Kiernan exchanged discovery with Atty. Kelleher. Exhibit D at p. 46 ll. 13-23.

41. One of the types of discovery that Kiernan provided to Atty. Kelleher in the Downey murder case was exculpatory evidence. Def. Mot. To Continue Trial

(attached as Exhibit L); September 28, 1982 Letter from Kieran to Atty. Kelleher (attached as Exhibit M).

42. Kiernan has no present memory of what documents were turned over to Atty. Kelleher in the Downey murder case. Exhibit D at p. 46 ll. 13-16.

43. Kiernan has no present memory of documenting what he turned over to Atty. Kelleher in the Downey murder case. Exhibit D at p. 47 ll. 1-8.

44. Kiernan has no memory of whether he turned the report over to Atty. Kelleher before Toro's trial. Exhibit D at p. 88 ll. 22-24, p. 89 ll. 1-9.

45. Toro has no knowledge of what documents were turned over to Atty. Kelleher. Dep. Of Angel Toro p. 66-67 (attached as Exhibit N).

46. Toro's first trial in Suffolk Superior Court for the Downey ended in a mistrial. Amend. Compl. ¶ 11 (attached as Exhibit Z).

47. Toro was re-tried for the Downey murder on June 13, 1983 and lasted 13 days. Exhibit X.

48. Pennsylvania State Trooper Joseph Pierotti ("Trooper Pierotti") testified that he first met Toro on May 9, 1981, at the Raystown Country Inn. Trial Transcript of <u>Commonwealth v. Angel Toro</u>, day 4 page 82 (attached as Exhibit O).

49. Toro produced a Massachusetts driver's license on the name of Carlos Rosa. Exhibit O day 4 pages 82-83.

50. Trooper Pierotti searched Toro's room at the Raystown Country Inn on May 9, 1981 and found a .32 caliber revolver, a black basket weave clip holder with a .45 caliber clip and ammunition, four .357 caliber bullets, four special

hollow bullets, three .38 special bullets, 6 Smith and Wesson bullets, two .30 carbine caliber bullets, one nine millimeter bullet, a marijuana pipe and a small plastic bag with a small amount of suspected marijuana. Exhibit O day 4 pages 85-87.

51. Special Agent Patrick Hayes ("Agent Hayes"), from the Bureau of Alcohol, Tobacco, Firearms and Explosives, testified that Toro appeared clean shaven on June 27, 1981. Exhibit O day 4 page 72.

52. Toro provided Agent Hayes with a Massachusetts driver's license in the name of William Correnti with Toro's photograph. Exhibit O day 4 page 71.

53. Toro later identified himself to Agent Hayes as Angel Toro. Exhibit O day 4 page 72.

54. Special Agent Charles Bopp ("Agent Bopp") from Bureau of Alcohol, Tobacco, Firearms and Explosives also testified on behalf of the Commonwealth. Exhibit O day 4 page 119.

55. Agent Bopp was familiar with Toro and the five different aliases that he used. Exhibit O day 4 page 122.

56. William McElroy ("McElroy") testified on behalf on the Commonwealth on June 20, 1983. Exhibit O day 5 page 66.

57. At that time, McElroy was a licensed gun smith in Huntington, Pennsylvania. Exhibit O day 5 page 67.

58. McElroy first met Toro in January 1981. Exhibit O day 5 page 69.

59. Toro had a beard in January 1981. Exhibit O day 5 page 71.

60. Toro had told McElroy that he had been in Boston over the Easter weekend, 1981. Exhibit O day 5 page 74.

61. Toro was in McElroy's gun shop on the Tuesday, April 21, 1981. Exhibit O day 5 page 73.

62. Toro was clean shaven on Tuesday, April 21, 1981. Exhibit O day 5 page 73.

63. McElroy saw Toro with $21,000 in cash on Tuesday, April 21, 1981. Exhibit O day 5 page 82.

64. Toro offered to buy half of McElroy's business with the cash. Exhibit O day 5 page 86.

65. McElroy testified he had seen Toro clean shaven from January through April, 1981. Exhibit O day 5 page 89.

66. McElroy testified that throughout that time period, Toro also had a beard. Exhibit O day 5 page 90.

67. Kathy Jo Keefer ("Keefer") testified on behalf of the Commonwealth in the case against Toro. Exhibit O day 5 page 93.

68. Keefer testified that she was living with William McElroy and her daughter. Exhibit O day 5 page 94.

69. Sometime in April 1981, Keefer met an individual by the name of Sam Rich. Exhibit O day 5 page 94.

70. Keefer identified Toro at trial as the individual she knew as Sam Rich. Exhibit O day 5 pages 96-97.

71. Keefer also knew Toro by the name of Carlos Rosa. Exhibit O day 5 page 97.

72. On April 17, 1981, the Friday before Easter, Toro told Keefer that he was taking a trip up north. Exhibit O day 5 pages 99-100.

73. Keefer testified that Toro's facial appearance on April 17, 1981 was "clean cut, not a heavy beard, but a thin beard." Exhibit O day 5 page 100.

74. Keefer testified that she also saw Toro the Tuesday after Easter. Exhibit O day 5 page 100.

75. Toro told Keefer he had just returned from Boston. Exhibit O day 5 page 101.

76. On June 21, 1983, Casper Diamond testified for the Commonwealth. Exhibit O day 6 page 9.

77. Diamond identified Toro as the individual he saw in the Howard Johnson's Lobby the night of the Downey murder. Exhibit O day 6 page 9.

78. Diamond was at the Howard Johnson's on Sunday, April 19, 1981 with Harry Miller. Exhibit O day 6 page 10.

79. Diamond and Mr. Miller ate dinner at the restaurant. Exhibit O day 6 page 11.

80. At approximately quarter past seven, Diamond got up from the dinner table to go to the bar. Exhibit O day 6 page 12.

81. The hotel bar was closed until seven thirty. Exhibit O day 6 page 12.

82. On his way back into the restaurant, Diamond saw the cashier in the hotel lobby. Exhibit O day 6 page 13.

83. Diamond went back to the bar at seven thirty to get a beer. Exhibit O day 6 page 15.

84. There were four other people present in the bar. Exhibit O day 6 page 17.

85. Diamond had a beer at the bar and left the bar at eight o'clock. Exhibit O day 6 pages 18-19.

86. On his way back to the restaurant, Diamond saw a gentleman in the lobby facing the cashier's booth. Exhibit O day 6 page 20.

87. Diamond described the gentleman as having dark hair, no beard and "a little dark skin." Exhibit O day 6 page 23.

88. Diamond returned to table with Mr. Miller and began eating his super. Exhibit O day 6 page 28.

89. Diamond heard a sound that sounded like fireworks, a minute to a minute and a half after he returned to the table. Exhibit O day 6 page 28.

90. Diamond met with two detectives from the Boston Police Department on May 3, 1981 at the Howard Johnson's. Exhibit O day 6 pages 30-31.

91. Diamond met with them in the manager's officer with the assistant manager, Norman Rich. Exhibit O day 6 page 31.

92. The detectives brought in photographs for Diamond to view to see if he could identify the man he saw in the lobby on April 19, 1981. Exhibit O day 6 page 31.

93. Diamond was not able to identify the individual through the photo array. Exhibit O day 6 page 31.

94. At trial, Diamond identified Toro in court as the individual that he observed in the lobby of Howard Johnson's on April 19, 1981 moments prior to Kathleen Downey's murder. Exhibit O day 6 page 32.

95. Atty. Kelleher cross-examined Diamond at trial. Exhibit O day 6 page 37.

96. Atty. Kelleher attempted to impeach Diamond on his memory. Exhibit O day 6 page 41.

97. Atty. Kelleher inquired about medication that the Diamond took prior to his testimony. Exhibit O day 6 page 42.

98. Diamond had two beers on the night on the murder. Exhibit O day 6 page 50.

99. Montgomery also testified about the individual she saw in the hotel lobby almost immediately after the murder. Exhibit O day 6 page 75.

100. Montgomery testified that she arrived at Howard Johnson's between six thirty and quarter of seven on April 19, 1981. Exhibit O day 6 page 77.

101. Montgomery was the only bartender working the evening of the Downey murder. Exhibit O day 6 page 78.

102. Montgomery recalled Diamond leaving the bar that night at the beginning of an Archie Bunker television program. Exhibit O day 6 page 80.

103. Shortly after eight o'clock, Montgomery heard a popping sound. Exhibit O day 6 pages 81-82, day 6 pages 82-83.

104. As she was walking to the lobby, Montgomery heard a" ping ping" noise that she recognized as money coming out of the cash register. Exhibit O day 6 page 83.

105. Montgomery saw a male backing away from the cash register. Exhibit O day 6 page 86.

106. At trial, Montgomery described the male as wearing a sport coat and shirt. Exhibit O day 6 page 86.

107. Montgomery observed the male was putting something in his right hand pocket. Montgomery first saw the male's profile as he turned around in the cashier's booth, and went to the door of the cage. Exhibit O day 6 pages 86-87.

108. Once out of the cage, the male turned over his right shoulder and looked towards the back wall of the cage. Exhibit O day 6 page 88.

109. At the moment, Montgomery could see his face. Exhibit O day 6 page 88.

110. Montgomery spoke to the police the night that Kathleen Downey was murdered. Exhibit O day 6 page 93.

111. At trial, Montgomery admitted that she initially told the police that she did not see anything the night of the Downey murder. Exhibit O day 6 page 94.

112. Montgomery finally told the police what she saw the following Friday. Exhibit O day 6 page 95.

113. Montgomery met with Detectives Arthur Linsky, Paul McDonough, Stephen Murphy and Robert Neville of the Boston Police Department. Exhibit O day 6 pages 96-98.

114. Montgomery initially described the person that she saw on April 19, 1981 at the Howard Johnson's to Detective Murphy. Exhibit O day 6 page 98.

115. At trial, Montgomery described a male with dark hair, with a sharp nose and chin, a thick black moustache and was either Puerto Rican or Mediterranean. Exhibit O day 6 page 99.

116. Sometime between April 24 and May 3, 1981, Montgomery viewed a set of photographs in an effort to identify the man at the Howard Johnson's on April 19, 1981. Exhibit O day 6 pages 99-100.

117. At that time, Montgomery did not see the individual in the photographs and therefore, did not identify anyone. Exhibit O day 6 page 100.

118. On May 3, 1981, Montgomery had a second opportunity to view a group of photographs. Exhibit O day page 100.

119. Montgomery selected the photograph of Toro as the person that she observed in the cage on April 19, 1981. Exhibit O day 6 page101.

120. Montgomery also testified that she went to Harrisburg, Pennsylvania on July 7, 1981 to view a line-up to see if the individual she saw in the cage was there. Exhibit O day 6 page 104.

121. In Pennsylvania, Montgomery identified Toro as the person she saw after the murder. Exhibit O day 6 page106.

122. Montgomery identified Toro in court before the jury as the man she saw in the cage after the Kathleen Downey's murder. Exhibit O day 6 page

123. Atty. Kelleher crossed examined Montgomery. Exhibit O day 6 page 113.

124. Atty. Kelleher attempted to impeach Montgomery on her statements to the police. Exhibit O day 6 page 146.

125. Atty. Kelleher addressed the fact that the police never asked Montgomery if she saw a gun. Exhibit O day 6 page 146.

126. Atty. Kelleher also elicited testimony about the statements Montgomery gave to the sketch artist, Neville. Exhibit O day 6 page 123.

127. At trial, Montgomery admitted that she observed the man in the cage for five seconds. Exhibit O day 6 page 128.

128. The defense was based on misidentification and alibi. Exhibit O day 2 page 207.

129. Thirty-nine (39) people testified at Toro's trial: twenty-five (25) for the Commonwealth and fourteen (14) for the defense. Witness list in Commonwealth v. Toro (attached as Exhibit P).

130. Toro was found guilty in the second trial and sentenced to life in prison. Exhibit Z at ¶¶ 1 and 12.

131. In 1990, Toro retained the office of Stern, Sharpiro, and Cohn to represent him in his petition of a new trial. Dep. of Patricia Garin at p. 7 ll.1-10 (attached as Exhibit Q).

132. Attorney Patricia Garin ("Atty. Garin") reached out to and received documents from all of Toro's prior attorneys: Willie Davis, Frank Kelleher, and Kenneth King. Exhibit Q at p. 10 ll.12-23.

133. Atty. Garin did not keep any documentation or logs detailing which documents she received from any of Toro's prior attorneys. Exhibit Q at p. 11 ll. 10-24.

134. Atty. Garin does not have any knowledge of what documents were turned over from the Suffolk county District Attorney's Office to Atty. Kelleher before Toro's trial. Exhibit Q at p. 100-101.

135. Atty. Garin does not have any knowledge of what documents were turned over from the Suffolk county District Attorney's Office to Atty. Kelleher before Toro's trial. Exhibit Q at p. 101-102.

136. Between 1993 and 2004, Atty. Garin wrote several letters to the Suffolk County District Attorney's Office in an attempt to recreate the defense file that was incomplete. July 25, 1993 Letter from Atty. Garin to R.J. Cinquegrana (attached as Exhibit R); July 14, 1994 Letter from Atty. Garin to Robert J. McKenna (attached as Exhibit S); May 31, 1996 Letter from Atty. Garin to Robert J. McKenna (attached as Exhibit T); July 31, 1996 Letter from Atty. Garin to Robert J. McKenna (attached as Exhibit U).

137. Some of the things Atty. Garin's file was missing in 1993 (i.e. videotape and ballistics report) were things that were put into evidence at Toro's trial (Ex 17 and 23, respectively). Exhibit R; Exhibit S; Commonwealth v. Angel Toro "List of Exhibits" (attached as Exhibit V).

138. In 1993, Atty. Garin recalls attending a meeting at the SCDAO with members of the SCDAO and members of the Boston Police Department. Exhibit Q at p. 43-44, 72-73.

139. Atty. Garin does not recall which members of the Boston Police Department were present. Exhibit Q at p. 72-73.

140. This meeting was held at Atty. Garin's request as a result of her suspicion that Kiernan had created his own duplicate files outside of the main SCDAO files in the homicide cases he handled. Exhibit Q at p. 42-43.

141. Atty. Garin was aware that this suspicion was held by other members of the defense bar and had heard a news story about it. Exhibit Q at p. 42-43.

142. Atty. Garin believed that Kiernan may have maintained his own secret file in the Toro case which may have contained exculpatory evidence which she had not seen. Exhibit Q at p. 42-43.

143. The purpose of the meeting was to get the Suffolk County District Attorney's Office to check if such a file existed. Exhibit Q at p. 42-43.

144. Atty. Garin also requested that the Boston Police Department's file be reviewed. Exhibit Q at p. 82.

145. Murphy does not recall attending this large meeting but does recall being present at a small meeting involving him, Suffolk County Assistant District Attorney Dennis Collins ("ADA Collins") and Atty. Garin. Exhibit C at p. 60.

146. At this meeting, Atty. Garin asked Murphy if he was aware of any secret file maintained by ADA Kiernan in the Toro case. Exhibit C at p. 61.

147. Murphy was not aware of any such file. Exhibit C at p. 61-62.

148. Murphy does not recall Atty. Garin or ADA Collins asking him to go through the contents of the Boston Police Department file to see if there were any statements in that file that were not already turned over. Exhibit C at p. 62.

149. Atty. Garin wrote a June 19, 2001 letter to ADA Collins referencing reports she had received on other suspects. June 19, 2001 letter from Atty. Garin to ADA Collins (attached Exhibit 4). The DA's file contained a folder of other suspects which included police reports of other possible suspects of the Downey murder and photographs of other suspects of the Downey murder.

SCDAO folder on other suspects in *Commonwealth v. Angel Toro* (attached Exhibit 5). Exhibit Q pages 51-58.

150. Boston Police Department Detective Wayne Rock was assigned to assist ADA Collins prepare for a motion for new trial. Aff. of Wayne Rock (attached as Exhibit W).

151. As part of this assignment, Detective Rock reviewed the contents of the Boston Police Department's file on the Downey murder. Exhibit W.

152. Sometime before the hearing on August 13, 2004, in the file, Detective Rock observed a copy of a May 1, 1981 Boston Police Department report regarding the Malden robbery and provided it to ADA Collins. Exhibit W.

153. The copy in the file was a photocopy of the report not the original. Exhibit W.

154. Not having seen this report in the District Attorney's file in 2004, ADA Collins turned this report over to Toro and on September 13, 2004, filed a motion to vacate Toro's conviction. Suffolk Superior Court Docket for Commonwealth v. Toro Exhibit X.

155. Atty. Garin did not have this report in her file. Exhibit Q at p. 81-82.

156. On September 16, 2004, Judge Mitchell Sikora vacated Toro's conviction. Exhibit X.

157. On October 4, 2004, the Suffolk County District Attorney's Office filed a *nolle prosequi* in the case against Toro for the Downey murder. Exhibit X.

158. On September 14, 2007, Toro filed this suit against Murphy. United States District Court Docket for Toro v. Murphy 07-11721-PBS (attached as Exhibit Y).

159. Toro alleges Murphy violated his constitutional rights by withholding a Boston Police Report dated May 1, 1981 and the accompanying composite sketch. Exhibit Z ¶¶ 23 and 27; Toro Response to Murphy's First Set of Interrogatories, Response #15 (attached as Exhibit AA).

160. The Suffolk County District Attorney's Office does not have a log of any of the people in their office that have accessed their *Commonwealth v. Angel Toro* file between 1981 and today. Dep. of Mario Mazzone at p. 22 ll. 23-24, p. 23-25. (attached as Exhibit BB); Suffolk County District Attorney's Log "Homicides at Bulfinch" (attached as Exhibit CC).

161. The Suffolk County District Attorney's Office does not have a log of any of the documents contained in their *Commonwealth v. Angel Toro*. Exhibit BB at p. 32-33.

Respectfully submitted,

DEFENDANT, STEPHEN MURPHY
By his attorneys:

William F. Sinnott
Corporation Counsel


/s/ Raquel D. Ruano
Raquel D. Ruano, BBO#658735
Alexandra Alland, BBO#652152
Evan C. Ouellette BBO#655934
Assistant Corporation Counsels
City of Boston Law Department
Room 615, City Hall
Boston, MA 02201
(617) 635-4039 (Ruano)
(617) 635-4031 (Alland)
(617) 635-4048 (Ouellette)

**<u>Certificate of Service</u>**

   I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non registered participants on June 30, 2009.


_/s/ Raquel D. Ruano_
Raquel D. Ruano