**CIVIL ACTION NO. 07 CA 11721 - PBS**

ANGEL TORO,
    **Plaintiff,**

**v.**

STEPHEN MURPHY
    **Defendant.**

## DEFENDANT STEPHEN MURPHY'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

### I.    INTRODUCTION

Now comes the Defendant, Stephen Murphy ("Murphy") and moves pursuant to Fed.R.Civ.P. 56 for summary judgment on all of Plaintiff, Angel Toro's ("Plaintiff") remaining claims against him. After much pairing down of Plaintiff's action, all that remains are two counts against a single defendant, Stephen Murphy, and each of these counts involves the same singular allegation. Plaintiff's remaining counts, Count I (Withholding of Exculpatory Evidence) and Count II (Conspiracy) are brought pursuant to 42 U.S.C. §1983 and allege that Plaintiff was wrongfully convicted of the murder of Kathleen Downey as a result of Murphy's purposeful withholding of exculpatory evidence in the form of a May 1, 1981 Boston Police Department report ("the report") and a Malden Police composite sketch ("the sketch"). Murphy is entitled to summary judgment on these §1983 claims because: (1) there is absolutely no evidence that the report and sketch were not turned over to Plaintiff's defense counsel or the Suffolk County Assistant District Attorney who prosecuted and convicted Plaintiff; (2) even if the report and sketch were not disclosed, their non-disclosure did not affect the outcome of

Plaintiff's trial; and (3) there exists absolutely no evidence that the report and sketch were purposefully withheld by Murphy.

## III.   STANDARD

### A.  Summary Judgment Standard

In a motion for summary judgment, the Court must consider the "facts and the reasonable inferences there from in the light most favorable to the nonmoving party," Freadman v. Metro. Prop. and Cas. Ins. Co., 484 F.3d 91, 94 (1st Cir.2007).  Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). "Once the moving party avers the absence of genuine issues of material fact, the nonmovant must show that a factual dispute does exist, but summary judgment cannot be defeated by relying on improbable inferences, conclusory allegations, or rank speculation."  Ingram v. Brink's, Inc., 414 F.3d 222, 228-29 (1st Cir.2005).  "[S]ummary judgment can be entered even where ambiguous, often murky concepts such as motive and intent are involved…." Id., citing Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir.1991).

### B.  42 U.S.C. § 1983 Standard

For a police officer to be liable under 42 U.S.C. § 1983, the plaintiff "must show by a preponderance of the evidence that: (1) the challenged conduct was attributable to a person acting under color of state law; and (2) the conduct deprived the plaintiff of rights secured by the Constitution or laws of the United States."  Velez-Rivera v. Agosto-Alicea, 437 F.3d 145, 151-52 (1st Cir.2006).  Because § 1983 is not a source of substantive rights in and of itself, summary judgment is appropriate where the plaintiff fails to identify the deprivation of a specific

constitutional right.  See Martineau v. Kurland, 36 F. Supp. 2d 39, 42 (D. Mass. 1999).

Moreover, the second element requires that the plaintiff establish that the police officer's conduct

was the "cause of the alleged deprivation."  Johnson v. Mahoney, 424 F.3d 83, 89 (1st Cir.2005).

### C. Standard Of Proof For A 42 U.S.C. § 1983 Action For Wrongful Conviction Based On The Withholding Of Exculpatory Evidence.

In order to sustain a viable § 1983 wrongful conviction action based on the withholding

of exculpatory evidence a plaintiff must prove: (1) the withheld evidence constituted exculpatory

Brady material, i.e. that a reasonable probability exists that had the evidence been produced prior

to trial, the result of plaintiff's criminal proceeding would have been different (see U.S. v.

Bagley, 473 U.S. 667, 681, 105 S.Ct. 3375, 3383 (1985); see also Strickler v. Greene, 527 U.S.

263, 296, 119 S.Ct. 1936, 1955 (1999)); (2) the withholding caused the plaintiff to be subjected

to be deprived of his constitutional right to due process in the form of a fair trial (See Sowell v.

Vose, 1990 WL 235442 *2, (D.Mass.1990), citing Baker v. McCollan, 443 U.S. 137, 140, 99

S.Ct. 2689, 2692 (1979)); and (3) the exculpatory evidence was intentionally withheld in bad

faith (Burke v. Town of Walpole, 2004 WL 507795, *25-26 (D. Mass.2004)).

## II.   ARGUMENT

### A. Summary Judgment Is Appropriate As There Is No Evidence That The Report And Sketch Were Not Turned Over To The Suffolk County District Attorney's Office.

The Plaintiff alleges that Murphy violated his constitutional right to a fair trial by failing

to disclose an allegedly exculpatory police report and sketch to the Suffolk County District

Attorney's Office ("SCDAO") before the Plaintiff's criminal trial in June 1983.  SOF ¶ 158.  No

evidence exists, however, to support Plaintiff's allegation.

On May 1, 1981, Murphy, along with Detective Richard Walsh went to Malden to get

information on a robbery that had taken place the day before.  SOF ¶ 14.  Murphy went to the

City of Malden Police Department where he was given information on a robbery that occurred on April 30, 1981 in which one of the suspects, Pasquale Cardone ("Cardone") was shot to death. SOF ¶¶ 9-12. Murphy got a description of Cardone and wrote a May 1, 1981 Boston Police Department report ("the report") regarding the information received. SOF ¶¶ 16-17. The Malden Police Department file contained a sketch of Cardone's unidentified accomplice in the Malden robbery ("the sketch"). SOF ¶ 15. The Plaintiff alleges that Murphy was aware of the sketch and did not disclose either the May 1, 1981 report or sketch to the SCDAO prior to Plaintiff's June 1983 murder trial. SOF ¶158. Plaintiff bases this conclusory allegation entirely on the following facts: 1) a search of the SCDAO file conducted in 2004 did not yield this report or sketch; and 2) Plaintiff's appellate counsel, Patricia Garin's ("Atty. Garin") statement that the defense file she received after taking over Plaintiff's representation in 1993 did not contain the report or sketch. These facts do not, as a matter of law, demonstrate that Murphy failed to disclose the reports to the SCDAO prior to Plaintiff's 1983 trial.

1.  <u>There is no evidence which demonstrates that the Suffolk County District Attorney's Office did not receive the report and sketch prior to trial.</u>

There is no evidence in this case to support the Plaintiff's allegations that the May 1, 1981 robbery report or sketch were not turned over to the SCDAO. The Assistant District Attorney who handled the case at trial, John Kiernan ("ADA Kiernan") has no recollection of whether he received the report and sketch prior to the 1983 trial or whether they were contained in the SCDAO file at that time. SOF ¶ 20. ADA Kiernan did not keep any notes as to what documents he received, any exhaustive index of what was contained in the SCDAO file, or any list of what documents he disclosed to Plaintiff's defense counsel prior to trial. SOF ¶¶ 37, 39, 43-45.

Murphy has no recollection of whether the police report or the sketch were produced to the SCDAO. SOF ¶ 18. Indeed, he has no recollection of ever seeing or possessing the sketch before trial. SOF ¶ 19. However, Murphy's typical procedure in producing discovery in homicide cases to the SCDAO was to bring the Boston Police Department file to the prosecuting ADA so that the ADA would go through the file and select documents from it in order to meet the ADA's discovery obligations. SOF ¶ 22. ADA Kiernan also remembers this as the general practice by which the Boston Police would turn over their file contents to him. SOF ¶ 21. In fact, unknown portions of the Boston Police file on the Downey murder were kept in ADA Kiernan's office for an unknown amount of time. SOF ¶ 23.

The fact that the SCDAO file did not contain the report or sketch in 2004 does not demonstrate that the SCDAO did not have them in 1983. By 2004, twenty-three years had passed since the murder of Kathleen Downey and the creation of the report and Murphy's alleged discovery of the sketch. Within those twenty-three years, the SCDAO admits that an unknown number of people have possessed the SCDAO's *Commonwealth v. Angel Toro* file or have had access to it. SOF ¶ 160. The SCDAO also admits that whatever documents were contained in the file at any given time cannot be determined because the SCDAO never kept any index of the contents of the file or any logs detailing what documents may have been removed or by whom. SOF ¶ 161. Therefore, it is impossible to determine whether any documents, including the report and sketch, were taken out of the file within this twenty-three year period.

    2.   <u>There is no evidence which demonstrates that Plaintiff's trial counsel did not receive the report and sketch prior to trial.</u>

Under <u>Brady v. Maryland</u>, the Supreme Court ruled that where the prosecution suppresses evidence favorable to an accused, it violates the accused's due process rights where the evidence is material either to guilt or punishment. 373 U.S. 83, 87 (1963). This duty is only

for the prosecutor and does not extend to the police.  <u>Campbell v. State of Maine</u>, 632 F.Supp. 111, 121 (D.Me. 1985), *aff'd,* 787 F.2d 776 (1st Cir.1986).  Murphy's duty under <u>Brady</u> was to disclose exculpatory evidence to the SCDAO; not directly to Plaintiff's defense counsel. Therefore, even if Plaintiff's trial counsel did not receive the report and sketch, this is not demonstrative as to whether Murphy complied with his <u>Brady</u> responsibilities.  However, Murphy still argues that there is no evidence that Attorney Frank Kelleher ("Atty. Kelleher"), Plaintiff's defense counsel in his 1983 murder trial, did not receive the report and sketch before Plaintiff's trial and conviction.

While Plaintiff's appellate attorney, Atty. Garin has stated that she had never received the report or sketch, Atty. Garin did not take over Plaintiff's defense or receive the contents of a "defense file" until ten (10) years after the Plaintiff's murder conviction.  SOF ¶¶ 130-131. Indeed, there is no evidence to demonstrate that the contents of the file received by Atty. Garin matched the contents of Atty. Kelleher's file.  There is no evidence whatsoever of any continuity between these files.  SOF ¶ 133.  There is no evidence of the existence of any index or other proof as to what may have been contained within or removed from Atty. Kelleher's file before he withdrew as Plaintiff's counsel.  SOF ¶ 133.  Atty. Kelleher is now deceased.   In fact, Atty. Garin acknowledges that she has no idea what documents had been turned over from the SCDAO to Atty. Kelleher prior to trial or whether or not Plaintiff's trial counsel had the report and sketch at the time of trial.  SOF at ¶ 134.   Further, Atty. Garin has no idea what documents Defendant Murphy turned over to the SCDAO.  SOF at ¶ 135.  Atty. Garin only knows that she herself did not receive this report as part of the file she obtained in 1993 - ten years after the trial. SOF ¶ 155.

Further, the evidence demonstrates that Atty. Garin did not receive the complete contents of Kelleher's trial file when she took over Plaintiff's representation ten (10) years after trial. SOF ¶ 136. At least three attorneys (Attorneys Willie Davis, Frank Kelleher, and Kenneth King) had control over this "defense file" before Atty. Garin received it and no documentation exists as to what documents they received from prior counsel, maintained themselves, or turned over to subsequent counsel. SOF ¶¶ 132-133. Indeed, when Atty. Garin requested assistance from the SCDAO in helping her recreate the defense file, she requested documents and evidence which had clearly been possessed by Atty. Kelleher in 1983, because they had been put into evidence during Toro's murder trial. SOF ¶¶ 136-137. Atty. Garin requested things like the ballistics report of the spent bullet and the videotape of the scene at Howard Johnson's. SOF ¶ 137. Both these items were entered into evidence during Toro's trial – Trial Exhibits 17 and 23 respectively. SOF ¶ 137. Clearly Atty. Garin was missing documents and evidence that Atty. Kelleher had at the time of trial. This discredits any conclusory argument that Atty. Kelleher must not have had the report and sketch at the time of trial simply because Atty. Garin did not have them ten (10) years later.

While the Plaintiff may put forth conclusory allegations or even rank speculation that neither he nor his defense counsel Atty. Kelleher had this report prior to his trial, it is simply not enough to withstand a motion for summary judgment. Ingram v. Brink's, Inc., 414 F.3d 222, 228-29 (1st Cir.2005). For these reasons, the Defendant Stephen Murphy argues that summary judgment is proper and asks the Court to allow his motion.

**B. Murphy Is Entitled To Summary Judgment On Plaintiff's Claims Because There Exists No Evidence That Murphy Intentionally Withheld Exculpatory Evidence With Bad Faith Or That This Alleged Failure To Disclose Evidence Was The Result Of Something More Than Murphy's Inadvertence Or Mere Negligence.**

A police officer can be liable under the Fourteenth Amendment's Due Process Clause, pursuant to § 1983 for withholding exculpatory evidence. See Brady v. Dill, 187 F.3d 104, 114 (1st Cir.1999). However, while evidence that a police officer possessed exculpatory evidence and inadvertently or even negligently failed to produce it will support a Brady challenge to a criminal conviction, it will not sustain a valid § 1983 wrongful conviction claim. The Supreme Court, addressing the question of "when tortious conduct by state officials rises to the level of a constitutional tort" for purposes of an alleged due process violation, has held that "the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property." Daniels v. Williams, 474 U.S. 327, 328, 106 S.Ct. 662, 665 (1986). "[T]he protections of the Due Process Clause, whether substantive or procedural are just not triggered by lack of due care." Davidson v. Cannon, 474 U.S. 344, 344, 106 S.Ct. 668, 669 (1986). In order to sustain a § 1983 wrongful conviction claim based on a failure to disclose exculpatory evidence, a plaintiff must show that the exculpatory evidence was intentionally withheld and that the intentional withholding was "in bad faith or with either the intent to violate Plaintiff's constitutional rights or with deliberate indifference to those rights." Reid v. Simmons, 163 F.Supp.2d 81, 90 (D.N.H. 2001). aff'd, 47 Fed. Appx. 5 (1st Cir.2002) (per curiam), cert. denied, 540 U.S. 894, 124 S.Ct. 237 (2003).

Therefore, conclusive evidence that a Brady violation occurred is only one necessary element of a § 1983 action against the violator. On this point, this Court has recognized:

> *Brady* and its progeny do not hold that the failure to disclose exculpatory evidence *qua* failure to disclose exculpatory evidence is, in and of itself, a violation of one's constitutional rights. Brady, and its most notable kissing

cousins, Giglio v. U.S., 405 U.S. 150 (1972) and U.S. v. Agurs, 427 U.S. 97 (1976) hold[], at most, that the failure of the prosecutor to disclose exculpatory evidence to the defense at trial amounts to a denial of a fair trial in violation of the due process clause.

…

A Brady violation that resulted in overturning of [a] plaintiff's conviction is a necessary, but not a sufficient, condition for § 1983 liability on the part of the police. It is a necessary condition because the Brady violation establishes the requisite threshold of constitutional injury (a conviction resulting in loss of liberty) below which no § 1983 action can lie. It is not a sufficient condition, however, because the Brady duty is a no fault duty and the concept of constitutional deprivation … *requires that the officer had intentionally withheld the evidence for the purpose of depriving the plaintiff of the use of that evidence during his criminal trial.* This is what is meant by "bad faith." Burke v. Town of Walpole, 2004 WL 507795, *25-26 (D. Mass.2004) (emphasis added).[1]

The record in the instant case, when viewed in the light most favorable to the Plaintiff, does not contain a shred of evidence that Murphy intentionally withheld the report or that any failure to disclose this report was the result of more than mere negligence. Porter v. White, an Eleventh Circuit case presents an almost identical record to the instant case with regard to insufficient proof of knowledge or intent. Porter, 483 F.3d. 1294.

In Porter, the defendant, a sheriff investigator was sued under § 1983 for withholding an exculpatory report from plaintiff and the State Attorney's Office at the time of plaintiff's rape trial, which raised the potential culpability of another suspect. Id. at 1307. The court, for purposes of its summary judgment determination assumed the following facts: the defendant sheriff possessed the exculpatory report prior to plaintiff's trial; the defendant was required by his Sheriff's Office policy to turn over the report to the State Attorney's Office prior to trial; defendant understood this requirement prior to the trial; and despite this, the defendant did not

---

[1] Although circuits differ as to what degree of culpability is necessary on the part of the officer withholding exculpatory evidence in order to establish § 1983 liability, either actual bad faith (see Jean v. Collins, 221 F.3d 656, 663 (4th Cir.2000); Villasana v. Wilhoit, 368 F.3d 976, 980 (8th Cir.2004); Clemmons v. Armontrout, 477 F.3d 962, 965-966 (8th Cir.2007)); or deliberate indifference to or reckless disregard for an accused's rights (see Tennison v. City and County of San Francisco, --- F.3d ----, 2009 WL 1758711, *9 (9th Cir.2009); Steidl v. Fermon, 494 F.3d 623, 631 (7th Cir.2007)), there is uniformity that the withholding must be knowing and cannot be supported by a showing of mere inadvertence or negligence. Daniels, 474 U.S. at 334; Porter v. White, 483 F.3d 1294, 1308 (11th Cir.2007), cert. denied, 128 S.Ct. 1259 (2008).

turn the over the report to the State Attorney's Office.[2] Id. at 1310. The court held that under

these facts, no civil rights violation had occurred because "[t]he strongest permissible inference

that one might conceivably draw from these facts is that the [] report failed to reach the State

Attorney's Office on account of some negligent act or omission properly attributable to [the

defendant], the official charged with the duty to deliver the police reports to the prosecution."

Id.

    In the instant case, even if the SCDAO did not receive the report and sketch prior to trial

and this failure was attributable to Murphy, there is absolutely no evidence to show that the

SCDAO's alleged non-receipt of these documents was caused by any intentional, knowing or

even reckless act by Murphy or that Murphy committed this withholding with bad faith or ill-will

toward the Plaintiff. At best, Plaintiff relies upon the same conclusory facts as did the plaintiff in

Porter: that Murphy possessed the report, knew of its exculpatory value and his duty to produce

it to the prosecutor and that he failed to do so. As in Porter, based on this record, "there is

absolutely no evidence from which a jury could reasonably infer intent to withhold, recklessness,

or anything more than mere negligence. Because [Plaintiff] is unable to show that the []

report[s] failed to reach the [prosecutor's office] as a consequence of some more-than-negligent

act or omission on the part of [Murphy], [this Court] must reject his due process claim." Id. at

1311.

    Indeed, although neither Murphy nor anyone else has any recollection as to whether the

report and sketch were turned over to the SCDAO before the 1983 trial, there is one glaring piece

---

[2] The evidence alleged to have been withheld in Porter was far more exculpatory than the report in the instant case. The "Hendricks report" as it is called in Porter, involved a summary of a conversation with a man who was observed at the hotel where the rape took place just hours after the rape occurred. Id. at 1298-1299. The report also included a description of this man which was nearly identical to the description given by the victim of the attacker. Id. Indeed this report indicated that the man bore a far closer resemblance to the victim's description than the plaintiff who was ultimately convicted of the rape. Id. The report even indicated that the man was observed smoking the same brand of cigarette as one that was believed to have been left behind by the attacker. Id.

of circumstantial evidence that strongly suggests that Murphy did not secretly withhold these documents or purposefully try to cover them up in any way. The report located in the Police file in 2004 is a photocopy not the original. SOF ¶ 153. If Murphy's purpose was to bury this exculpatory report away from the SCDAO and the Plaintiff, he certainly would not have made a photocopy of it and let that copy sit in police file for twenty three years.

It appeared during discovery in this matter that Plaintiff intends to base his allegation that Murphy intentionally withheld exculpatory evidence on a claim that more than a decade after Plaintiff's conviction, Murphy attended a meeting with Plaintiff's counsel, Atty. Garin in which she made inquiries as to whether the SCDAO possessed any previously undisclosed exculpatory evidence. The existence of this "meeting" does demonstrate that Murphy purposefully withheld the report and sketch from the SCDAO.

At some time in 1993, ten years after Plaintiff's conviction, Atty. Garin recalls attending a meeting at the SCDAO with members of the SCDAO and members of the Boston Police Department. SOF ¶ 138. She does not recall which members of the Boston Police Department were present. SOF ¶ 139. This meeting was held at Atty. Garin's request as a result of her suspicion that ADA Kiernan had created his own duplicate files outside of the main SCDAO files in the homicide cases he handled. SOF ¶ 140. She was aware that this suspicion was held by other members of the defense bar and had heard a news story about it. SOF ¶ 141. She believed that ADA Kiernan may have maintained his own secret file in the Toro case which may have contained exculpatory evidence which she had not seen. SOF ¶ 142. The purpose of the meeting was to get the SCDAO to check if such a file existed. SOF ¶ 143. Atty. Garin also requested that the Boston Police Department's file be reviewed. SOF ¶ 144.

Murphy does not recall attending this large meeting but does recall a small meeting with him, ADA Collins and Atty. Garin SOF ¶ 145. At this meeting, Atty. Garin asked Murphy if he was aware of any secret file maintained by ADA Kiernan in the Toro case. SOF ¶ 146. Murphy was not aware of any such file SOF ¶ 147. Murphy does not recall Atty. Garin or ADA Collins asking him to go through the contents of the Boston Police Department file to see if there were any statements in that file that were not already turned over. SOF ¶ 148.

These facts do not support any inference that Murphy purposefully withheld the report and sketch or even that he knew that it had not been received by the SCDAO or Plaintiff's trial counsel. This "meeting" had nothing to do with the report and sketch or even any withholding of evidence by any members of the Boston Police Department. SOF ¶¶ 138-148. In contrast, it was held to address whether SCDAO was withholding evidence from defense counsel. SOF ¶¶ 140-143, 146. Further, there is no evidence Murphy was asked to conduct any review of the police file. SOF ¶ 148. Even if he had been asked, there is no evidence that Atty. Garin ever communicated to Murphy what documents she had and did not have. Likewise, there is no evidence that the SCDAO communicate which documents it had turned over to Plaintiff's various defense counsel. Lastly, this meeting took place ten years after trial, so even if Murphy did know that Atty. Garin's file did not contain the report and sketch at that time, this would not demonstrate that Atty. Kelleher had not possessed them ten (10) years earlier. SOF ¶ 138. Since no evidence exists which might demonstrate that Murphy intentionally withheld the report or sketch, he is entitled to summary judgment on Plaintiff's § 1983 claims.

**C. Murphy Is Entitled To Summary Judgment Because The Plaintiff Cannot Establish That The May 1, 1981 Boston Police Department Report Or The Malden Sketch Would Have Impacted The Plaintiff's Guilty Verdict For The Murder Of Kathleen Downey Triggering A Brady Finding.**

Summary judgment is appropriate as to Plaintiff's claim for withholding evidence in violation of 42 U.S.C. § 1983, because even in the light most favorable to the Plaintiff, the evidence fails to establish that the disclosure of the May 1, 1981 police report or the Malden Sketch would have impacted the jury's finding of guilt. Plaintiff contends that Murphy withheld from discovery the report and sketch in the criminal trial of *Commonwealth v. Angel Toro*. SOF ¶ 159. The Supreme Court defined the requirements for the disclosure of evidence in a criminal matter, requiring the disclosure only of evidence that is both favorable to the accused and "material either to guilt or to punishment." Brady v. Maryland, 373 U.S. 83, 87 (1983).

It is not a forgone conclusion that every instance of withheld evidence rises to the level of a Brady violation. "[A] finding of materiality of the evidence is required" prior to setting aside a jury's verdict." Giglio v. United States, 405 U.S. 150, 154 (1972). A plaintiff must prove that the evidence withheld is material, i.e that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of plaintiff's criminal proceeding would have been different. Bagley, 473 U.S. at 681; see also Strickler v. Greene, 527 U.S. at 296. A "reasonable probability" is a probability sufficient to undermine confidence in the jury's verdict. Id.

Plaintiff cannot establish that the allegedly withheld report and sketch would have altered the jury's verdict if Plaintiff's counsel had possessed them at the time of trial. Plaintiff's counsel, Atty. Kelleher was provided with information regarding additional suspects other than Toro and Cardone who were investigated by the Boston Police Department as part of its investigation into Kathleen Downey's Murder. SOF ¶ 149. This information regarding other suspects included police reports from additional robberies during the same time frame, as well as

two photographs of other individuals that resembled the description of Kathleen Downey's murderer. SOF ¶ 149. Atty. Kelleher chose not to present any evidence of these other suspects at the trial and mounted only an alibi and misidentification defense. SOF ¶ 128.

It is the Plaintiff's burden to demonstrate that the report and sketch, viewed within the totality of the evidence that was presented, undermines the guilty verdict. Based on the totality of the evidence that was presented against Mr. Toro, the May 1, 1981 report and sketch do not cast doubt on in the truth of the jury's guilty verdict. The trial began on June 13, 1983 and proceeded over a period of fourteen days. SOF ¶ 47. The jury delivered their guilty verdict on June 28, 1983. SOF ¶ 47. The Commonwealth called twenty-five witnesses and the defense called fourteen witnesses. SOF ¶ 147.

Also, there was an abundance of evidence that the Commonwealth utilized to prove Toro's guilt beyond a reasonable doubt. The May 1, 1981 police report and the sketch do not affect the evidence that was proven beyond a reasonable doubt at trial. The report addresses a robbery at O'Neil's pharmacy in Malden, almost two weeks after Kathleen Downey's murder. SOF ¶ 9. The fact that a gun was also involved in this Malden hold-up does not speak to Mr. Toro's guilt, especially where it was a different caliber that the one used in the Downey murder. The deceased, Pasqual Cardone is referenced in the report as matching the general description of the assailant in the Downey murder. SOF ¶ 17. However, Toro was positively identified at trial by the two eye witnesses. SOF ¶¶ 77, 122. The report also indicated that Cardone had no criminal history. SOF ¶ 9. Toro cannot demonstrate that the report would have influenced the jury to find him not guilty. Based upon the two eye witnesses identification of Toro, the number of alias that he used during that time frame, and the guns and ammunition that he had access to, the jury found that the Commonwealth proved Toro murdered Kathleen Downey on April 19,

1981 beyond a reasonable doubt. The May 1, 1981 police report does not undermine the verdict and is therefore not Brady material.

### D. Summary Judgment Is Appropriate Because the Plaintiff Was Not Prejudiced By The Alleged Withholding Of The Report And Sketch, Therefore Under §1983 There Was No Constitutional Violation.

The alleged withholding of the report and sketch did not violate Angel Toro's constitutional right to a fair trial and therefore, Murphy is entitled to summary judgment. Brady and its progeny do not hold that the failure to disclose exculpatory evidence is, in and of itself, a violation of one's constitutional rights. See Burke, 2004 WL 507795 at *25-26 (D. Mass.2004). A Brady violation that resulted in overturning of plaintiff's conviction is a necessary, but not a sufficient, condition for § 1983 liability on the part of the police. An element necessary to making out a constitutional violation of this nature is that the withheld evidence was not only exculpatory but that its withholding resulted in prejudice and caused plaintiff to be deprived of his constitutional right to due process in the form of a fair trial. See Strickler v. Greene, 527 U.S. 263, 281-82 (1999); see also Sowell v. Vose, 1990 WL 235442 *2, (D.Mass.1990), citing Baker v. McCollan, 443 U.S. 137, 140, 99 S.Ct. 2689, 2692 (1979).

Based upon the voluminous evidence that was presented to the jury in the *Commonwealth v. Angel Toro*, there is nothing in the record that indicates the withheld report prejudiced Toro. There were two eyewitnesses at trial, Casper Diamond and Jean Montgomery, who identified Toro as the individual that they both observed in the lobby of the Howard Johnson's on April 19, 1981. SOF ¶ 77,122. Atty. Kelleher was in possession of other suspects identified by the police department and did not use them in his defense of Toro. SOF ¶ 149. During cross examination of the two eye witnesses, he attempted to impeach their credibility by questioning the amount of time that they observed the individual, the angle at which they saw the man, and other factors the

impeded their ability to correctly identify Toro. SOF ¶ 77,122. However, the jury found Toro guilty, indicating that they did not find these arguments persuasive. SOF ¶ 47. If Atty. Kelleher had used the May 1, 1981 police report and sketch to impeach the credibility of the two eyewitnesses, it is logical to conclude that the jury would not have been influenced by those arguments either. The trial transcript indicates that Toro's defense was centered on alibi and misidentification. Despite Atty. Kelleher's impeachment of the two eye witnesses that identified Toro as the individual that they saw in Howard Johnson's on April 19, 1981, the jury disregarded the defense theory and convicted Toro. The withheld documents did not cause Toro to suffer an unfair trial and therefore, did not violate Toro's constitutional rights. Without the requisite showing of a constitutional violation, Stephen Murphy is entitled to summary judgment.

### E. Murphy Is Entitled To Qualified Immunity.

The First Circuit applies a three-part test for qualified immunity. A police officer is entitled to qualified immunity unless "(1) the facts alleged show the defendants' conduct violated a constitutional right, and (2) the contours of this right are 'clearly established' under then-existing law (3) such that a reasonable officer would have known that his conduct was unlawful." Berube v. Conley, 506 F.3d 79, 82 (1st Cir.2007), citing Santana v. Calderon, 342 F.3d 18, 23 (1st Cir. 2003).[3]

As has already been argued, Plaintiff cannot survive the first prong because, as a matter of law, Murphy did not violate Plaintiff's right to due process. However, even if Murphy's actions did objectively violate Plaintiff's right to due process, Plaintiff cannot survive the

---

[3] In its recent decision in Pearson v. Callahan, --- U.S. ----, 129 S.Ct. 808, ---L.Ed.2d ---- (2009), the Supreme Court allowed lower courts to, where application of the first prong of the this test would prove unhelpful, move directly to an exploration of whether a constitutional right was "clearly established" without first testing whether this right was violated.

remaining prongs because it was not clearly established, in light of the then existing case law, that Murphy's alleged failure to disclose the report and sketch was unconstitutional.

An officer is not entitled to qualified immunity only when, in light of clearly established then-existing law, a reasonable officer, in his shoes, would have known that his conduct was unlawful. Berube, 506 F.3d at 82. A right is clearly established only where the law defines that right in a quite specific manner, and that the announcement of the rule establishing the right must [is] unambiguous and widespread, such that the unlawfulness of particular conduct will be apparent ex ante to reasonable public officials." Brady v. Dill, 187 F.3d at 116, citing Wilson v. Layne, 526 U.S. 603,613 (1999).

The inquiry into whether an officer is entitled to qualified immunity focuses on an evaluation of the defendant's conduct "in light of the particular circumstances known at the time the challenged conduct took place." Cookish v. Powell, 945 F.2d 441, 443 (1st Cir.1991), quoting Brennan v. Hendrigan, 888 F.2d 189, 192 (1st Cir.1989). "The relevant, dispositive inquiry ... is whether it would be clear to a reasonable officer that his conduct was unlawful." Saucier v. Katz, 533 U.S. 194, 202 (2001). "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" Pearson v. Callahan, 129 S.Ct. 808, 815 (2009), quoting Groh v. Ramirez, 540 U.S. 551, 567 (2004) (KENNEDY, J., dissenting). A "reasonable, although mistaken, conclusion about the lawfulness of one's conduct does not subject a government official to personal liability." Lowinger v. Broderick, 50 F.3d 61, 65 (1st Cir.1995), quoting Cookish, 945 F.2d at 443.

In applying the qualified standard the courts are "discourage[d] … from assessing what a reasonable officer could or could not believe beyond asking whether his conduct was plainly

incompetent." Medeiros v. Town of Dracut, 21 F.Supp.2d at 88, citing Hunter v. Bryant, 502 U.S. 224, 229 (1991); Anderson v Creighton, 483 U.S. at 641. "This accommodation for reasonable error exists because 'officials should not err always on the side of caution' because they fear being sued." Hunter, 502 U.S. at 229, citing Davis v. Scherer, 468 U.S. 183, 196 (1984). Indeed, the courts will defer to the officer's judgment where "a jury could not find that his conduct was so deficient that no reasonable officer could have made the same choice." Medeiros, 21 F.Supp.2d at 87, citing Roy v. Inhabitants of City of Lewiston, 42 F.3d at 695. "After all, qualified immunity for public officials serves important societal purposes, and it is therefore meant to protect 'all but the plainly incompetent or those who knowingly violate the law.'" Brady v. Dill, 187 F.3d 104, 116 1st Cir. 1999), quoting Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

Murphy is entitled to qualified immunity because it was not clearly established within the First Circuit at the time of Plaintiff's 1983 trial that police officers had a constitutionally mandated obligation to turn over reports or other evidence that was, on its face, anything less than patently exculpatory. Reid v. Simmons, 163 F.Supp.2d 81, 95 (D.N.H. 2001). aff'd, 47 Fed. Appx. 5 (1st Cir.2002) (per curiam), cert. denied, 540 U.S. 894, 124 S.Ct. 237, 157 L.Ed.2d 170 (2003). "That is particularly true since only recently have courts begun to conclude that police officers might bear some liability under § 1983 for withholding material evidence that leads to a Brady violation." Reid, 163 F.Supp.2d at 95, citing Brady v. Dill, 187 F.3d 104, 114 (1st Cir.1999) "In other words, the notion that police officers can be personally civilly liable for conduct giving rise to Brady violations is a relatively recent development in the law and, even today, its character and contours remain somewhat ill-defined, particularly in [the First] circuit." Reid, 163 F.Supp.2d at 95.

Murphy is also entitled to qualified immunity because it would not have been clearly established to a reasonable officer in his shoes that the report and sketch constituted patently exculpatory <u>Brady</u> material. As discussed above, the import of these documents to Toro's defense would not have been so plainly obvious to Murphy that he should have been able to predict that their disclosure would have swayed the jury to find in Toro's favor at trial. <u>See</u> <u>Giglio</u>, 405 U.S. at 154; <u>Strickland</u>, 466 U.S. at 695. The court must ask whether every reasonable official in the position of [Murphy] would understand that withholding those particular pieces of evidence would undermine confidence in the outcome of [Toro's] trial" with the understanding that [Murphy] did not have the benefit of knowing exactly how the totality of the evidence would play out at trial." <u>Reid v. Simmons</u>, 163 F.Supp.2d 81, 90 (D.N.H. 2001), quoting <u>McMillian v. Johnson</u>, 88 F.3d 1554, 1569-70 (11th Cir.1996).

Indeed, a reasonable officer in Murphy's shoes would have understood that the nature of this evidence took it out of the realm of <u>Brady</u> entirely. The sketch and report do not involve information known solely to the Boston Police Department. SOF ¶ 15. Rather, the sketch was created and maintained by the Malden Police and was part of its file. SOF ¶ 15. Pursuant to the First Circuit's decision in <u>Lugo v. Munoz</u>, which was existing law at the time when Murphy's alleged <u>Brady</u> duty arose, Murphy had no duty to disclose exculpatory facts which were not within the Boston Police Department's exclusive control where these facts were public records or otherwise available to a diligent defender. <u>Lugo v. Munoz</u>, 682 F.2d 7, 9-10 (1st Cir. 1982). Also, the report contains only Murphy's own subjective beliefs regarding a possible unsupported connection between Cardone and the Downey Murder. SOF ¶¶ 10, 17. Murphy could not have predicted that this evidence would have even been admissible or relevant as part of Toro's defense, let alone that it was likely to have supported an acquittal.

**F. Murphy Is Entitled To Summary Judgment On Plaintiff's Conspiracy Claim Because There Exists No Evidence That Plaintiff's Civil Rights Were Violated By Murphy Or Anyone Else With Whom Murphy Conspired.**

A civil rights conspiracy is defined as "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages." Earle v. Benoit, 850 F.2d 836, 844 (1st Cir. 1988) (citations omitted). Moreover, "for a conspiracy claim to be actionable under [§] 1983, the plaintiff has to prove that there has been, besides the agreement, an actual deprivation of a right secured by the Constitution and laws." Earle, 850 F.2d at 844. Here, summary judgment is appropriate because there is no absolutely no evidence that Murphy entered into an agreement or a common plan or otherwise "reached a meeting of the minds" with anyone else to withhold exculpatory evidence in violation of Plaintiff's constitutional right to due process.

## IV. CONCLUSION

For the foregoing reasons, the Defendant, Stephen Murphy, moves that this Court grant summary judgment in his favor on all counts of Plaintiff's Amended Complaint against him, with prejudice.

**DEFENDANT STEPHEN MURPHY REQUESTS AN ORAL ARGUMENT ON THIS MOTION.**

Respectfully submitted,

DEFENDANT, STEPHEN MURPHY
By his attorneys:

William F. Sinnott
Corporation Counsel


/s/ Raquel D. Ruano
Raquel D. Ruano, BBO#658735
Alexandra Alland, BBO#652152
Evan C. Ouellette BBO#655934
Assistant Corporation Counsels
City of Boston Law Department
Room 615, City Hall
Boston, MA 02201
(617) 635-4039 (Ruano)
(617) 635-4031 (Alland)
(617) 635-4048 (Ouellette)

**<u>Certificate of Service</u>**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non registered participants on June 30, 2009.


 /s/  Raquel D. Ruano
Raquel D. Ruano